UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                          :
UNITED STATES OF AMERICA                                  :        05-CV-5816 (ARR)
                                                          :        (MDG)
                              Plaintiff,                  :
                                                          :        <u>NOT FOR</u>
              -against-                                   :        <u>PUBLICATION</u>
                                                          :
APPROXIMATELY 1,170 CARATS OF ROUGH                       :        <u>OPINION AND ORDER</u>
DIAMONDS SEIZED AT JOHN F. KENNEDY                        :
INTERNATIONAL AIRPORT ON JANUARY 13, 2004,               :
                                                          :
                      Defendants in rem.,                 :
                                                          :
MARK KALISH AND MARCO KALISH IMPORTS,                    :
INC.,                                                     :
                                                          :
                              Claimants,                  :
                                                          :
MAPLE TRADE FINANCE CORPORATION,                         :
                                                          :
                              Claimant.                   :
                                                          :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

On January 13, 2004, claimant Mark Kalisch entered the United States at John F.

Kennedy International airport carrying approximately 1,170 carats of rough diamonds from

Brazil (the "Defendant Diamonds").  Kalisch declared in his customs form that the diamonds had

an import value of $160,000 and presented them to a customs official for inspection.  The

official, after determining that the importation did not comply with the requirements of the Clean

Diamond Trade Act (CDTA or Act), 19 U.S.C. §§ 3901 <u>et seq.</u>, seized the diamonds.  On

December 13, 2005, the United States instituted this <i>in rem</i> forfeiture action against the

diamonds under the CDTA, Dkt. No. 1, and Kalisch filed a verified Statement of Claim on behalf

1

of himself and his company, Marco Kalisch Imports, Inc. ("Kalisch"), asserting a proprietary interest in the Defendant Diamonds, see Dkt. No. 4.  After discovery the parties cross-moved for summary judgment.  See Dkt. Nos. 69.  For the reasons that follow, the United States' motion is granted and Kalisch's motion is denied.[1]

## BACKGROUND

This case involves interpretation and application of the Clean Diamond Trade Act (CDTA or Act), codified at 19 U.S.C. §§ 3901-13.  The origin and structure of the statute are briefly set out below.

### I.     The Clean Diamond Trade Act

In May of 2000, representatives of diamond-producing African nations and the international diamond industry met in Kimberley, South Africa, to address trade in "conflict diamonds," i.e., diamonds that are traded in order to help finance armed rebellions and other activities aimed at the destabilization of legitimate governments.  The representatives referred to the "devastating impact from conflicts fueled by trade in conflict diamonds on the peace, safety and security of people in [diamond-producing] countries."  Recognizing that unregulated trade in diamonds from those nations "can be directly linked to the fueling of armed conflict, the activities of rebel movements aimed at undermining or overthrowing legitimate governments, and the illicit traffic in . . . armaments," they issued the so-called Kimberley Process Certification Scheme (KCPS), see "Kimberley Process

_____

[1]      On February 28, 2006, Maple Trade Finance Corporation ("Maple Trade") filed a notice of claim also asserting an interest in the Defendant Diamonds.  Dkt. No. 8.  The United States and Maple Trade have agreed to postpone the resolution of Maple Trade's claims until after the resolution of the claims between the United States and Kalisch.  See Govt.'s Mem. of L. in Supp. of Pltf.'s Mot. for Summ. Judg. at 1, n. 1. (Dkt. No. 69) (hereinafter "Govt.'s Mem.").

Certification Scheme" Preamble, available at http://www.kimberleyprocess.com/download/getfile/4 (last visited July 22, 2008) ("KPCS Decl."). The scheme is designed to ensure that participating nations will prohibit importation and exportation of "rough diamonds"[2] that are not accompanied by a Kimberly Process Certificate (KPC), see id. at 5-6, Sects. II(a), III(b). The KPC is defined as a tamper-resistant document to be issued by relevant customs authorities within each Participant nation that contains, inter alia, information regarding the source and value of diamonds to be exported, as well as a statement that the diamonds comply with all other requirements of the KPCS. See id. at 12, Annex I. The KPCS also requires that signatories implement the scheme by "establish[ing] a system of internal controls designed to eliminate the presence of conflict diamonds from shipments of rough diamonds imported into and exported from [their] territor[ies]" and by "maintain[ing] dissuasive and proportional penalties for transgressions." Id. at 7, Sect. IV(a)-(d). Meeting in Interlaken, Switzerland on November 5, 2002, numerous members of the United Nations, including the European Community as representative of all its members, Brazil, and the United States, signed the Interlaken Declaration, formally adopting and expressing their commitment to the KPCS. See "Interlaken Declaration" dated 11/5/02, available at http://www.kimberleyprocess.com/download/getfile/5 (last visited July 22, 2008).

Shortly thereafter, Congress enacted the CDTA to meet the United States' obligations under the Interlaken Declaration. See Clean Diamond Trade Act, Pub. L. No. 108-19, 117 Stat. 631 (Apr. 25, 2003). The statute is prefaced by Congressional findings, echoing those set forth in the KPCS' Preamble, concerning the serious international problems created by trade in conflict diamonds.

---

[2] "Rough diamonds" are defined as those that are "unworked or simply sawn, cleaved or bruted." KPCS Decl. at 4. See also 19 U.S.C. § 3902(9) (defining "rough diamond" for purposes of the CDTA).

Specifically, Congress found that "[f]unds derived from the sale of rough diamonds are being used by rebels . . . to finance military activities, overthrow legitimate governments, subvert international efforts to promote peace and stability, and commit horrifying atrocities against unarmed civilians;" 19 U.S.C. § 3901(1), and identified these problems as occurring in particular nations that produce rough diamonds, including Sierra Leone, Angola, and the Democratic Republic of Congo. Id. Referring to prior efforts made by the United Nations Security Council and Congress's implementing legislation restricting or prohibiting importation of rough diamonds from certain specific, affected countries, id. at § 3901(4)-(5), Congress, implicitly suggesting their inadequacy, announced that, by this legislation, "[t]he United States is now taking further action against trade in conflict diamonds," id. at § 3901(5), "to end the trade in conflict diamonds." Id. at § 3901(3). Thus, Congress enacted the following regulatory scheme that applies to all exports and imports of rough diamonds by participating states, without geographic restriction as to source.

The CDTA directs the President to "prohibit the importation into, or exportation from, the United States of any rough diamond, *from whatever source*, that has not been controlled through the [KPCS]." Id. at § 3903(a) (emphasis added).[3] An importation or exportation of rough diamonds is "controlled through the [KPCS]" if it is an importation from or exportation to "the territory of a Participant" and is "carried out in accordance with the KPCS, as set forth in regulations promulgated by the President," or "under a system determined by the President to meet substantially the standards . . . of the KPCS." Id. at § 3902(2). In accordance with this provision, the President issued regulations requiring, inter alia, that any importation of rough diamonds into the United States and

---

[3]     The definition of "rough diamonds" under the CDTA is substantially similar to the definition under the KPCS, see supra n. 2, and is not material to the issues presented here.

any exportation of rough diamonds from the United States be accompanied by a Kimberley Process Certificate. 31 C.F.R. § 592.301(a)(1), (4).[4]

A Kimberley Process Certificate is "a forgery resistant document of a Participant that demonstrates that an importation or exportation of rough diamonds has been controlled through the [KPCS] and contains the minimum elements set forth in Annex I to the [KPCS]." 19 U.S.C. § 3902(5).[5] A "Participant" is defined as a state or customs territory recognized by the Secretary of State. The President is required to identify all Participants in a list published in the Federal Register. Id. at §§ 3902(7), 3905(b). Additionally, the CDTA designates the United States Bureau of Customs and Border Protection (CBP) as the "Importing Authority" for the United States under the Act, see 19 U.S.C. § 3905(a)(1). An Importing Authority is an "entit[y] designated by a Participant into whose territory a shipment of rough diamonds is imported as having the authority to enforce the laws and regulations of the Participant regulating imports, including the verification of the Kimberley Process Certificate accompanying the shipment." Id. at § 3902(4).[6]

_____

[4]       This regulation complies with the requirement of the KPCS that Participants "require a duly validated [Kimberley Process Certificate]" for shipments of rough diamonds imported from other Participants, see KPCS Decl. at 6, sect. III(b), and that they issue the KPC for shipments of rough diamonds on export, see id. at sect. II(a).

[5]       As noted previously, Annex I of the KPCS requires that the KPC list, inter alia, the origin of the diamonds, their weight and value, and a statement that the rough diamonds have been handled in accordance with the KPCS. See supra at p. 3.

[6]       These provisions comply with the KPCS, sect. IV(b), which requires Participants to designate an Importing Authority and an Exporting Authority to control shipments of rough diamonds and issue or validate KPCs. The CDTA lists the Census Bureau as the "Exporting Authority" under the Act, defined as the agency of an exporting Participant with the authority to validate the KPC. 19 U.S.C. §§ 3902(3), 3905(a)(2). A list of the Importing and Exporting Authorities of each Participant must also be compiled by the President and published in the Federal Register. 19 U.S.C. § 3905(b).

The enforcement mechanism of the CDTA is contained in § 8 of the act, codified at 19 U.S.C. § 3907. It imposes a civil penalty of up to $10,000 for any violation of the act, on a strict liability basis, and a fine of up to $50,000 and a term of imprisonment of up to 10 years for any willful violation. Id. at § 3907(a). In addition, the CDTA provides that "[t]hose customs laws of the United States, both civil and criminal, including those laws relating to seizure and forfeiture, that apply to articles imported in violation of such laws shall apply with respect to rough diamonds in violation of this chapter." Id. at § 3907(b); see also 31 C.F.R. § 592.601(a)(3).

The statute went into effect when the President issued an implementing directive on July 29, 2003. See Pub. L. 108-19, § 15; Exec. Order No. 13312, 68 F.R. 45151 (Jul. 29, 2003). Shortly thereafter, the President began to publish a list of Participants in the Federal Register. At the time of the events in question in this case, it is undisputed that the list of Participants included Brazil. See 68 F.R. 66523 (Nov. 26, 2003).

## II.    Factual Background[7]

Claimant Mark Allen Kalisch is a diamond merchant who has imported and exported diamonds to and from the United States for over 20 years, mainly from Brazil and to Belgium, respectively. See Decl. of Mark Kalisch dated Jan. 8, 2008 at ¶ 2 (Dkt. No. 80) ("Kalisch Decl."). In mid-2003 he began to purchase rough diamonds from newly discovered sources belonging to an Indian tribe in the Brazilian Amazon, id. at ¶ 5, and to import them into the United States without a KPC, believing that he was in compliance with the CDTA, see id. at ¶ 6.

---

[7]    The facts material to the resolution of this dispute are not seriously contested by the parties. Although the parties have submitted a voluminous record, only the facts relevant to the resolution of the issues presented are recounted here.

On January 12, 2004, Kalisch arrived at John F. Kennedy International Airport on a flight from Brazil, declared in his customs declaration that he carried with him "rough diamonds" with a total value of $165,000, see Customs Decl. of Mark Kalisch dated 01/12/04, submitted as Ex. 8 to Decl. of Laura Mantell in Supp. of Pltf.'s Mot. (Dkt. No. 70-8), and presented the Defendant Diamonds to a customs official for inspection, see Kalisch Decl. at ¶ 9. The importation was not accompanied by a Kimberley Process Certificate issued by the proper Brazilian Exporting Authority. See Verified Compl. at ¶¶ 14-15; Ans. to Compl. at ¶¶ 8-9 (Dkt. No. 8). Customs Inspector George Carberry, after consulting with the State Department, initially detained and subsequently seized the Defendant Diamonds, notwithstanding Kalisch's request that he be allowed to return them to Brazil or ship them to Belgium without entry into the United States. Id. at ¶ 14; see also Decl. of George Cranberry dated 05/18/07, submitted as Ex. E to Decl. of Max Folkenflik in Supp. of Kalisch's Mot. ("Folkenflik Decl.) (Dkt. No. 72), at 77-78.

On February 6, 2004, Kalisch sought a discretionary remission of forfeiture of the Defendant Diamonds from the United States Customs and Border Protection Agency (CBP), pursuant to 19 U.S.C. § 1595a(c) and the regulations issued thereunder, see Admin. Letter from CBP dated 4/1/04, submitted as Ex. A to Folkenflik Decl.[8] The CBP denied the petition, id., as well as Kalisch's motion for reconsideration of that decision, see Admin. Letter from CBP dated 8/2/05, submitted as Ex. B. to Folkenflik Decl. The United States then instituted the present *in rem* forfeiture against the Defendant Diamonds, seeking forfeiture under § 8(b) of the CDTA and 19 U.S.C. § 1595a(c).

---

[8] As will be explained in more detail below, infra at pp. 28-30, 19 U.S.C. § 1595a(c)(5) provides that, when forfeiture is required or authorized under § 1595a(c), it may be remitted or mitigated under the provisions of 19 U.S.C. § 1618.

### III.    The Parties' Motions

After conducting extensive discovery, the parties cross-moved for summary judgment. Kalisch argues that (1) the language of the CDTA and relevant forfeiture laws does not contemplate forfeiture of Brazilian diamonds openly declared to customs officials even if imported in violation of the CDTA; (2) in the alternative, if the CDTA does allow forfeiture of the Defendant Diamonds, the forfeiture of the Defendant Diamonds violates the Excessive Fines Clause of the Eighth Amendment, as interpreted by United States v. Bajakajian, 524 U.S. 321 (1998); and (3) the court should remand the case to the CBP for failure to properly consider his request for remission. The United States, in turn, argues that the plain language of the CDTA and relevant forfeiture laws allows forfeiture of the Defendant Diamonds, that such a forfeiture does not implicate the Excessive Fines Clause, and that this court should not entertain Kalisch's challenge to the CBP's denial of remission of the forfeiture.

### DISCUSSION

### I.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See generally Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). The substantive law determines the facts that are material to the outcome of a particular litigation.

See Anderson, 477 U.S. at 250; Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975).  If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. Proc. 56(e).  The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48.

## II.  Applicability of the CDTA to the Defendant Diamonds

The parties agree that the Defendant Diamonds were introduced into the United States from Brazil, a "Participant" within the meaning of the CDTA, without a KPC, in violation of the KPCS, 19 U.S.C. § 3905(a), and 31 C.F.R. § 592.301(a).  See, e.g., Pltf.'s Stat. Pursuant to Local Civ. R. 56.1 at ¶¶ 2-3 (Dkt. No. 71); Deft.'s Mem. of L. in Supp. of Mot. for Summ. Judg. at 2 (Dkt. No. 78) (hereinafter "Deft.'s Mem.") (admitting that "[t]he letter of the CDTA . . . was not [followed]"); Kalisch Decl. at ¶¶ 7-8.  The question before the court is whether the CDTA provides for forfeiture of rough diamonds voluntarily presented for inspection to a customs official, but imported without the required KPC in violation of the CDTA.

The analysis begins, as always, with the language of the statute, see Duncan v. Walker, 533 U.S. 167, 172 (2001) (collecting cases), keeping in mind that the CDTA is a statute that implements the United States' international obligations under a treaty.  The court must presume that Congress meant to comply fully with our international treaty obligations absent a clear indication to the

contrary, see, e.g., United States v. Kay, 359 F.3d 738, 755 n. 68 (5th Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 115, cmt. a (1987) ("It is generally assumed that Congress does not intend to repudiate an international obligation . . ..")).

## A.     The Language of the CDTA

As noted previously, the enforcement section of the CDTA, § 3907, provides for civil fines for any violation of the Act and criminal penalties for willful violations, "[i]n addition to the enforcement provisions [of] subsection (b)." 19 U.S.C. § 3907(a). Subsection (b) sets forth seizure and forfeiture as an available remedy, providing that "[t]hose customs laws of the United States, both civil and criminal, including those laws relating to seizure and forfeiture, that apply to articles imported in violation of such laws shall apply with respect to rough diamonds imported in violation of this chapter." Id. at § 3907(b). As its plain language makes clear, this provision does not itself mandate forfeiture of all rough diamonds imported in violation of the CDTA. Rather, by its terms, § 3907(b) incorporates into the CDTA and affords as remedies for violation of the Act all other customs seizure and forfeiture laws that apply to items imported in violation of customs law. Thus, when rough diamonds are imported in violation of the CDTA, they are forfeitable under the CDTA only to the extent they are forfeitable under other incorporated customs forfeiture provisions.

Kalisch complains that the Government interprets § 3907(b) as providing a basis for forfeiture of all rough diamonds imported in violation of the CDTA, independent of any other forfeiture provision. Although it is not clear that the government has in fact advanced this argument,[9] Kalisch is correct that § 3907(b) does not provide for what he characterizes as "blanket

_____

[9]     In attributing this contention to the government, Kalisch may be misinterpreting the government's response to his vague assertion that § 3907(b) is merely a "savings clause." See Deft.'s Mem. at 8. As the government correctly argues, the use of the words "seizure and

forfeiture" of all rough diamond importations that do not comply with the Act.  See Deft.'s Mem. at 10.  In the forfeiture provisions of many statutes, Congress has explicitly provided for forfeiture of all goods imported in violation of the particular law.  For example, the Lanham Act provides that merchandise imported in violation of that act "shall be seized and forfeited for violations of the customs laws." 19 U.S.C. § 1526(e).  Similarly, a section of the Tariff Act of 1930 provides that merchandise unladen prior to permission "shall be seized and forfeited."  19 U.S.C. § 1586(a).  See also 16 U.S.C. § 1540(e)(4)(A) (Endangered Species Act) ("all [items] imported contrary to the provisions of this Act  shall be subject to forfeiture"); 16 U.S.C. § 3374(a)(1) (Lacey Act) ("all [items] imported . . . contrary to the provisions of . . . this title . . . shall be subject to forfeiture").  By contrast, § 3907(b) does not state that all items imported in violation of the CDTA shall be forfeited; it provides, rather, that other customs laws relating to seizure and forfeiture shall apply to rough diamonds imported in violation of the CDTA.  In short, to justify a forfeiture of rough diamonds, the government must invoke another forfeiture provision of Title 19 and satisfy its requirements.

**B.**      **The Language of Subsection (c)(2)(B) of the General Forfeiture Statute,**
             **19 U.S.C. § 1595a**

The parties agree that the general forfeiture provision of Title 19, 19 U.S.C. § 1595a, is a "customs law . . . relating to seizure and forfeiture," 19 U.S.C. § 3907(b), but disagree as to whether it "applies to articles imported in violation of [the CDTA]."  See Govt.'s Mem. at 11; Deft.'s Mem. at 8.  Section 1595a provides, in relevant part: "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law . . . may be seized and forfeited if . . .  its

forfeiture" in subsection (b) unambiguously indicates that Congress intended forfeiture as an available remedy, at least for some violations of the CDTA.  See Govt.'s Opp. at 11.

11

importation or entry requires a license, permit or other authorization of an agency of the United States Government and the merchandise is not accompanied by such license, permit, or authorization." 19 U.S.C. §1595a(c)(2)(B).

As noted, the parties dispute whether importation of the Defendant Diamonds in violation of the CDTA falls within the scope of forfeitures authorized by §1595a(c)(2)(B).[10] The government argues that the Defendant Diamonds are subject to forfeiture because, under the CDTA, their "importation or entry requires a license, permit or other authorization of an agency of the United States Government," 19 U.S.C. § 1595a(c)(2)(B), and their importation was not accompanied by such authorization. See Govt.'s Opp. at 12-13; Govt.'s Mem. at 11, n.5. Kalisch responds that subsection (B) is inapplicable because under the CDTA, the Defendant Diamonds required a KPC from proper Brazilian authorities, not from any agency of the United States. See Deft.'s Mem. at 14. Kalisch's reading is at odds with the plain language of the statute, as he misunderstands, if not ignores the requirement that rough diamond importations under the CDTA be "authoriz[ed] [by] an Agency of the United States . . .."

Because neither Title 19 nor the regulations issued thereunder define the term "authorization" the court turns to "the fundamental cannon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary meaning." Harris v. Sullivan, 968

---

[10]     In addition to the forfeiture provision of subsection (c)(2)(B), the government also invokes as a basis for forfeiture of the Defendant Diamonds subsection (c)(2)(A) of the statute. That subsection provides that "merchandise . . . introduced into the United States contrary to law . . . may be seized and forfeited if . . . its importation or entry is subject to any restriction or prohibition which is imposed by law relating to health, safety, or conservation and the merchandise is not in compliance with the applicable rule, regulation, or statute." 19 U.S.C. §1595a(c)(2)(A). Because, as set forth below, the Defendant Diamonds are unquestionably subject to forfeiture under subsection (c)(2)(B), the court does not reach the applicability of this alternate forfeiture provision.

F.2d 263, 265 (2d Cir. 1992) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)); see also 2A Norman J. Singer, Sutherland Statutory Construction § 46:01 (6th ed. 2000). The ordinary meaning of "authorization" is "the conferment of legality; formal warrant or sanction." Oxford's English Dictionary 798 (2d Ed. 1989). Similarly, the verb "to authorize" means "to give formal approval to," id., or "to permit a thing to be done," Deluxe Black's Law Dictionary 133 (6th Ed. 1990). See also Webster's Third New International Dictionary 146 (1993) ("to endorse, empower, justify or permit by or as if by some recognized or proper authority.").

Under the CDTA, rough diamonds cannot be imported into the United States without the permission of the CBP, because that agency is the "Importing Authority" that has "the authority to enforce the laws and regulations of [the United States] including the verification of the [KPCS]," under the CDTA. See 19 U.S.C. § 3902(4). Brazil or any other Participant may provide the documents, namely the KPC, on which the CBP will rely in deciding whether or not to give formal approval to the importation, but the importation must nonetheless be sanctioned by the CBP. As the government correctly notes, the "CPB's authorization is only granted upon presentation of a valid KPC in accordance with the requirements of the CDTA . . .. Simply put, rough diamonds are not 'authorized' for entry into the United States unless they are accompanied by a KPC, regardless of whether the KPC is foreign . . . issued." Govt.'s Opp. at 12.

The government's construction of § 1595a(c)(2)(B) is consistent with how federal courts have applied the section to other laws. In United States v. Two Mitsubishi Pick-Up Trucks, 396 F.Supp.2d 117 (D.P.R. 2005), for example, the court dealt with the forfeiture of two vehicles that had been denied authorization for entry into the United States by the Environmental Protection Agency (EPA) and the Department of Transportation (DOT) because the vehicles failed to comply

13

with certain regulatory requirements, including the requirement that foreign manufacturers affix to the vehicles certification stickers stating that they complied with EPA's emissions standards. See id. at 119-20 (citing 49 C.F.R. §§ 551.45, 565 & 566). Because the EPA and DOT had refused to authorize entry of the vehicles on the ground that they lacked the required certifications, the court forfeited the vehicles under § 1595a(c)(2)(B). Id. In United States v. 863 Iranian Carpets, 981 F.Supp. 746, 748 (N.D.N.Y. 1997) and United States v. Three Burmese Statutes, No. 07-cv-250 (RJC), 2008 WL 2568151, at *2-3 (W.D.N.C. Jun. 24, 2008), district courts applied §1595a(c)(2)(B) to forfeit items imported from Iran and Burma, respectively, in violation of Congressional bans on importation of products from those countries. In these latter cases, the courts implicitly allowed forfeiture under § 1595a(c)(2)(B) because the importation could not receive the authorization of the proper agency of the United States.[11]

Faced with the formidable hurdle posed by the statute's clear language, Kalisch offers the unpersuasive argument that § 1595a(c)(2)(B) does not apply to the importation of the Defendant Diamonds because the importation is controlled by another subsection of the forfeiture statute, namely § 1595a(c)(3). See Deft.'s Mem. at 14. Subsection (c)(3) provides, in relevant part, that "[i]f the importation or entry of merchandise is subject to quantitative restrictions requiring a . . . permit . . . from the United States Government or from a foreign government or issuing authority pursuant to a bilateral or multilateral agreement, the merchandise shall be subject [to forfeiture only] if the

---

[11]    This plain reading of the word "authorization" does not render superfluous the words "license" and "permit" of § 1595a(c)(2)(B), as there are instances arising under other laws in which items cannot be brought into the United States without an application for a specific permit from the proper United States agency. See, e.g., United States v. 1,100 Machine Gun Receivers, 73 F.Supp.2d 1289 (D. Utah 1999) (forfeiting machine gun receivers under §1595a(c)(2)(B) because importer failed to apply for permit as required by law).

. . . permit . . . presented . . . is counterfeit." Because, when he presented the Defendant Diamonds to Customs Inspector George Carberry, he did not also present a counterfeit KPC, Kalisch contends that the Defendant Diamonds are not subject to forfeiture. See id. The argument is defeated by the plain text of § 1595a(c)(3). By its unambiguous terms, §1595a(c)(3) applies only to importations that are "subject to quantitative restrictions." The CDTA imposes no quantitative restrictions on the importation from Participants of rough diamonds accompanied with a valid KPC. It simply bans importation of *all* rough diamonds not accompanied by the certificate and allows importation of *all* rough diamonds that comply with the KPCS. Because the CDTA imposes no "quantitative restrictions," § 1593(a)(c)(3) does not apply to the Defendant Diamonds.

### C.    The Forfeiture of the Defendant Diamonds Under the CDTA Comports with the Legislative Intent of the Statute

Purporting to rely on the legislative intent of the CDTA, Kalisch invokes excerpts from the statute's legislative findings, writing that "the CDTA was designed to address ...[the] 'trade in conflict diamonds' ... used 'to finance military activities, overthrow legitimate governments ... and commit horrifying atrocities against unarmed civilians' in sub-Saharan Africa, specifically Sierra Leone, Angola and the Democratic Republic of the Congo.'" Deft.'s Mem. at 8-9 (quoting 19 U.S.C. § 3901(1)). Concluding from this excerpt that the statute "was aimed solely at the trade in 'conflict diamonds' to fund wars" in that region, id. at 13, he maintains that "the purpose of the statute is not advanced by the forfeiture of [the Defendant Diamonds, as they are] indisputably ... legitimate diamonds ... from Brazil [that] are not the 'conflict diamonds' to which the CDTA is addressed." Id. at 14. The argument cannot be squared with the plain language of the directly

applicable statutory provisions, much less the plain language of the statute as a whole, which creates a broad regulatory framework to effectively combat the evil that it was designed to ameliorate.

At the outset, the argument that the Defendant Diamonds should not be forfeited under CDTA because they were imported from Brazil rather than Africa is precluded by the unambiguous terms of the statute. The statute "prohibit[s] the importation or the exportation from the United States of any rough diamond, *from whatever source*, that has not been controlled through the [KPCS]." 19 U.S.C. § 3903(a) (emphasis added); 31 C.F.R. § 592.201 (a) ("any rough diamond, *from whatever source*, is prohibited, unless the rough diamond has been controlled through the [KPCS]") (emphasis added). Likewise, under 31 C.F.R. § 592.301(a), issued pursuant to 19 U.S.C. § 3902(2)(A), it is clear that the KPCS requirements "apply ... to the importation into the United States from a Participant ... of *any* shipment including *any* rough diamond," id. (emphasis added). It is undisputed that Brazil was a "Participant" at the time the Defendant Diamonds were seized, see 68 F.R. 66523 (Nov. 26, 2003). Accordingly, all of the cited statutory and regulatory provisions unquestionably subject the Defendant Diamonds from Brazil to the restrictions of the Act.

Nor do Kalisch's selected excerpts from the Congressional findings prefacing the CDTA advance his argument that "legitimate" rough diamonds from Brazil are exempt from the coverage of the Act. That Congress, in enacting the statute, intended to eliminate the evils wrought by conflict diamonds emanating from sub-Saharan Africa, as it indicated in a portion of its findings, does not limit the remedy Congress expressly chose to achieve that end. Recognizing the inadequacy of previous measures it had taken to stem the trade in conflict diamonds, 19 U.S.C. § 3901, and the need for "further action," id. at § 3901(5), Congress chose to address the concerns it had identified and to act to "end the trade in conflict diamonds," id. at § 3901(3), by adopting the broad regulatory

16

scheme created by the KPCS, id. at § 3901(6) , a universal certification scheme.  Such a universal scheme that subjects all rough diamonds to regulation regardless of the country of origin more effectively eliminates the trade in conflict diamonds by targeting not only direct, but also indirect trade and importation of African conflict diamonds transshipped through non-African countries. Moreover, permitting rough diamonds brought to the United States in violation of the CDTA to simply return to the international stream of commerce, rather than be removed from commerce entirely through seizure and forfeiture, would not, as Kalisch suggests, advance Congress' stated intent to eliminate all trade in conflict diamonds.

Given the unambiguous language of the statute, there is no reason to resort to legislative history.  See Deft.'s Opp. at 14.  See generally United States v. Holroyd, 732 F.2d 1122, 1125 (2d Cir. 1984).  Such resort, in any event, would not help Kalisch as he has not pointed to any item in that sparse legislative history contradicting the clear language of the statute.  The history indicates that the concerns Congress addressed in the Act arose from problems caused by trade in conflict diamonds in certain African nations, as Kalisch notes, see Deft.'s Mem. at 11.[12]  Nevertheless, the legislative history confirms that Congress intended to enact broad remedial measures to ensure that

---

[12]    See, e.g., Clean Diamond Trade Act, 149 Cong. Rec. H2895-01, H2897 (Apr. 8, 2003) (statement of Rep. Royce) (expressing concern with the diamond trade in Sierra Leone and Liberia); id. at H2898 (statement of Rep. Levin) (Congress focused on the "terrible toll trade in conflict diamonds has had on the people of sub-Saharan Africa [and on] legitimate diamond trade in countries such as Botswana, Namibia, South Africa, and Tanzania"); id. (statement of Rep. Houghton) (noting that the CDTA "attacks the problem of the trade in African diamonds"); id. at H2899 (statement of Rep. Smith-N.J.) (noting that "more than 6 million people from Sierra Leone, Angola, and the Democratic Republic of Congo have been driven from their homes by wars waged . . . for control for diamond mining areas"); see also The Clean Diamond Trade Act of 2003, 149 Cong. Red. S5004-02, at *S5004 (statement of Sen. DeWine) (Apr. 9, 2003) ("[o]ne area of the world where such atrocities are occurring on a daily basis is in Sierra Leone, Africa"); id. at *S5005 (statement of Sen. Leahy) ("[t]he role of diamonds in fueling brutal conflict in Africa . . . is well documented").

the CDTA apply to diamonds from whatever source and without geographical boundary, as the statute's language indicates.[13] One Senator noted during the CDTA floor debates that "[i]t is nearly impossible . . . to distinguish between the illegally gathered diamonds and legitimate or 'clean' stones," see 149 Cong. Rec. S5004-02, at *S5004 (Apr. 9, 2003) (statement of Sen. DeWine).

Nor does the legislative history of the CDTA help Kalisch establish that forfeiture was not a contemplated remedy under the CDTA. Although Kalisch is correct that there is nothing explicit in the legislative history that "suggests that . . . the CDTA was intended to establish a rule of forfeiture," see Deft.'s Mem. at 14, the clear language of the statute, as reviewed above, establishes a rule of forfeiture, and Kalisch has failed to point to anything in the legislative history showing Congress *did not* intend forfeiture to apply under § 1595a(c)(2)(B). At most, the legislative debates indicate that certain congressmen contemplated "severely punish[ing] violators of th[e] ban", 149 Cong. Rec. H2895-01, at *H2898 (statement of Rep. Houghton), or "impos[ing] costly . . . civil penalties", id. at *H2899 (statement of Rep. Lee).

---

[13]     See, e.g.,149 Cong. Rec. H2895-01, at *H2898 (statement of Rep. Lantos) (the CDTA "will make sure that the United States [is] not complicit in any further exploitation of diamonds to fuel civil conflict [by] prohibit[ing] the importation to . . . the United States of any rough diamonds, from whatever source, that are not controlled through the [KPCS]"); id. at *H2900 (statement of Rep. Snyder) (noting that "somebody can take a sock full of illegal diamonds, put it in their pocket, walk into a plane, and they have an ability to move wealth all over the world"); id. at *H2901 (statement of Rep. Jackson-Lee) (the CDTA "prohibits the import of diamonds into the United States unless the exporting country is implementing a system of controls" so that United States citizens "can be confident the . . . government is evaluating *every* diamond supply country") (emphasis supplied); see also 149 Cong. Rec. S5004-02, at *S5004 (statement of Sen. DeWine) (the CDTA's prohibition "means *every* diamond brought into the United States would require a certificate of origin and authenticity") (emphasis supplied).

In sum, nothing in the legislative history of the CDTA supports Kalisch's position that Congress did not intend the CDTA to allow forfeiture of rough diamonds imported from non-African countries.

### D. There is no Good Faith Defense to the CDTA or § 1595a(c)

A recurring theme in his submissions is Kalisch's repeated argument that the Defendant Diamonds should not be forfeited because he made every possible attempt to comply with the CDTA, see, e.g., Deft.'s Mem. at 7, 12-13, 15. The claim is predicated on the existence of a good faith defense to the forfeiture at issue here.

There is no language in the CDTA or in § 1595a(c) that provides for a good faith defense to forfeiture. Section 1595a(c) provides that certain items "shall" or "may" be forfeited, but the state of mind of the owner is not mentioned. This is unsurprising because in in rem forfeiture proceedings such as this, "[h]istorically, the conduct of the property owner [is] irrelevant; indeed the owner of forfeited property could be entirely innocent of any crime." United States v. Bajakajian, 524 U.S. 321 (1998); see also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 683 (1974) ("[T]he innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense."). As courts have noted in the context of forfeiture proceedings for violations of customs and environmental laws, "strict liability in . . . forfeiture actions is necessary to effect Congressional intent. To permit an importer to recover the property because he or she lacks culpability would lend support to the continued commercial traffic of the forbidden [item]." United States v. 1,000 Raw Skins of Caiman Crocodilus Yacare, No. 88-CV-3476, 1991 WL 41774 at *4 (E.D.N.Y. Mar. 14, 1991). Thus, a good faith defense is typically unavailable for violations of customs and environmental laws, such as laws barring the importation of items introduced by means of false

statements, see United States v. An Antique Platter of Gold, 184 F.3d 131, 138-39 (2d Cir. 1999) (holding that 18 U.S.C. § 545 provides no innocent owner defense), the Endangered Species Act, see United States v. One Handbag of Crocodilus Species, 856 F.Supp. 128, 134 (E.D.N.Y. 1994), and the Lacey Act, see United States v. 144,774 Pounds of Blue King Crab, 410 F.3d 1131, 1134 (9th Cir. 2005).

In a final attempt to circumvent the clear language of the statute and relevant authorities precluding a good faith defense, Kalisch contends that 19 U.S.C. § 1592, not § 1595a, should apply to the Defendant Diamonds. See Deft.'s Opp. at 15. Section § 1592 provides, in relevant part: "no person, by fraud, gross negligence, or negligence, may . . . introduce any merchandise into . . . the United States by means of any document . . . which is material and false, or any omission which is material." 19 U.S.C. § 1592(a)(1)(A). The statute also provides for a broad range of penalties, depending on the degree of the offender's culpability, but does not mention forfeiture. Thus, Kalisch argues, because he was at most negligent for failing to obtain a proper KPC, he is subject only to the minor civil penalties of § 1592, and the Defendant Diamonds are not subject to forfeiture.

Kalisch's argument fails because he ignores the language of the general forfeiture provision, § 1595(c)(4), which clarifies that the remedial provisions of §1592 apply only in limited circumstances not present here. Specifically, §1595a(c)(4) provides that "[i]f the merchandise is imported or introduced contrary to law . . . *and there are no issues as to the admissibility of the merchandise into the United States*, it shall not be seized except in accordance with section 1592 of this title." (emphasis added). Under the clear language of this provision, the Defendant Diamonds do not qualify for treatment under §1592 because there *is* an issue as to their admissibility into the United States: they are plainly inadmissible under the terms of the CDTA because they are not

accompanied by the required KPC.  See 19 U.S.C. § 3903(a); 31 C.F.R. § 592.301(a)(1), (4).  Thus, under the terms of § 1595a(c)(4), §1592 is inapplicable to the Defendant Diamonds and the statute affords him no assistance in his efforts to avoid forfeiture.

III.    **Applicability of the Excessive Fines Clause of the Eighth Amendment to the CDTA**

Because the Defendant Diamonds are forfeitable under the CDTA, the court must address Kalisch's argument that the forfeiture violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

A.    ***Bajakajian v. United States***

Under the leading case analyzing the Excessive Fines Clause, a forfeiture is unconstitutional if it constitutes "punishment for some offense," but does not "bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian v. United States, 524 U.S. 321, 327 & 334 (1998) (citations omitted).  The threshold question is thus whether the forfeiture constitutes a "punishment" or "fine" such that it is subject to the Excessive Fines Clause, or whether it is nonpunitive in nature, thus not implicating the Clause at all.

Bajakajian involved a defendant who attempted to leave the United States without reporting, as required by federal law, that he carried more than $10,000 in currency.  Id. at 324.  After customs inspectors discovered some $230,000 in cash in his checked baggage, Bajakajian falsely stated that he and his wife were transporting only an additional $15,000, although he was found to possess a total of $357,144.  Id.  Bajakajian was indicted on three counts: failure to file a required currency report, making a false material statement to officials of the United States Customs Service, and a count seeking forfeiture of the $357,144, pursuant to 18 U.S.C. § 982(a)(1).  That section provides,

in part, that the court, in imposing sentence on a person convicted of failing to file a required currency report, "shall order that the person forfeit to the United States any property . . . involved in such offense." 18 U.S.C. § 982(a)(1). Id. at 325.

Analyzing the circumstances surrounding the forfeiture, the Supreme Court had "little trouble concluding that the forfeiture of currency constitute[d] punishment," id. at 328. Specifically, the Court noted that the forfeiture was "an additional sanction [ordered] when imposing sentence on a person convicted of a willful violation of [the] reporting requirement;" that it was "imposed at the culmination of a criminal proceeding and requir[ed] conviction of an underlying felony;" and that it "c[ould] not be imposed upon an innocent owner of unreported currency, but only upon a person . . . convicted of a . . . violation." Id.

The Court also concluded that a forfeiture is more likely to constitute punishment when it serves the purpose of deterrence, as opposed to "the remedial purpose of compensating the Government for a loss." Id. at 329. The forfeiture at issue in Bajakajian served no remedial purpose, the Court reasoned, because remedial penalties typically compensate the Government for lost revenue, not a loss of information such as that caused by Bajakajian's offense. Id. at 329 (citing One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 237 (1972) (per curiam)). The Court qualified the importance of this distinction, however, noting that "[e]ven if . . . the forfeiture of respondent's currency is remedial in some way, the forfeiture would still be punitive in part," thus implicating the Excessive Fines Clause. See id. at 329, n. 4

Finally, the Court recognized that civil in rem forfeitures were traditionally "viewed as nonpunitive" and, as such, "were considered to occupy a place outside the domain of the Excessive Fines Clause." Id. at 330-31. The Court elaborated that traditional in rem forfeitures were directed

against "'guilty property' rather than against the offender himself," id. at 330 (citing Various Items of Personal Property v. United States, 282 U.S. 577, 581 (1931)) (footnote omitted). "The conduct of the property owner was irrelevant; indeed the owner of the forfeited property could be entirely innocent of any crime." Id. 330-31. Significantly, quoting Justice Story in Taylor v. United States, 3 How. 197, 210, 11 L.Ed 559 (1845), the Court reaffirmed: "laws providing for *in rem* forfeiture of goods imported in violation of customs laws, although in one sense 'imposing a penalty or forfeiture [,] . . . truly deserve to be called remedial'." Id. at 331. The Court cautioned, however, that "not all modern civil *in rem* forfeitures are nonpunitive . . . [b]ecause some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture," such as those allowing for *in rem* forfeiture of real property used to facilitate the commission of drug crimes. See id. at 331, n.6. Applying these principles, the Court concluded that the currency forfeiture before it bore none of the "hallmarks" of traditional *in rem* forfeitures because "the Government ha[d] not proceeded against the currency itself, but had instead sought and obtained a criminal conviction of respondent personally[;] [because] [t]he forfeiture serve[d] no remedial purpose [;] and [because the forfeiture could] not be imposed upon innocent owners." Id. at 331-32.[14]

---

[14]     Having concluded that the currency forfeiture was "punishment", the Court then held that it failed to meet a "proportionality" test, and was thus a violation of the Excessive Fines Clause. See Bajakajian, 524 U.S. at 333-43.

## B. Application to the CDTA

Bajakajian's guiding principles compel the conclusion that forfeitures under the CDTA, and the forfeiture of the Defendant Diamonds in particular, are not "punishment" and thus fall outside the reach of the Excessive Fines Clause.

First, the forfeiture at issue here is not "an additional sanction" imposed upon a person guilty of a crime. Unlike the currency forfeiture in Bajakajian, the criminal penalties of the CDTA, set forth in § 3907(a)(2), are wholly independent of the forfeiture provision of § 3907(b), which, by its clear terms, imposes forfeiture on innocent owners. Compare Bajakajian, 524 U.S. at 328 (citing Austin v. United States, 509 U.S. 602, 619 (1993) (holding forfeiture there to be a "fine", in part, because the statute at issue in Austin explicitly provided an innocent owner defense)). Indeed, with respect to forfeitures under § 3907(b), "the conduct of the property owner [is] irrelevant," see id. at 330 (citing Origet v. Unitd States, 125 U.S. 240, 246 (1888)). Second, forfeiture under § 3907(b) falls squarely within the category of in rem civil forfeitures traditionally considered nonpunitive because the Government proceeded only against the Defendant Diamonds, not against their owner, and the purpose of the forfeiture is not to punish the owner, see id. at 331-32, but rather "to end the trade in conflict diamonds," 19 U.S.C § 3901(3). Finally, since the forfeiture is imposed for violation of a customs law, it is historically considered remedial, not punitive. See Bajakajian, 524 U.S. at 331; Taylor, 3 How. at 210. Because the forfeiture of rough diamonds imported in violation of the CDTA bears none of the "hallmarks" of the forfeiture at issue in Bajakajian, it is not punitive and does not implicate the Eighth Amendment's Excessive Fines Clause.[15]

---

[15] Having concluded that the Clause is not implicated, the court need not consider whether the forfeiture is "excessive." See Bajakajian, 524 U.S. at 334-44.

This holding is consistent with post-Bajakajian cases that have determined whether particular forfeitures constitute "punishment" for purposes of the Eighth Amendment. In United States v. An Antique Platter of Gold, 184 F.3d 131 (2d Cir. 1999), the Second Circuit held that the forfeiture under 19 U.S.C. § 1595a(c) of a Sicilian antique imported in violation of customs laws prohibiting false statements in customs forms did not constitute a "fine" under Bajakajian. The court reasoned that the forfeiture was not punishment because "the nature of the statute that authorizes the forfeiture . . . is a customs law, traditionally viewed as non-punitive." An Antique Platter of Gold, 184 F.3d at 140. Like the Defendant Diamonds, and unlike the currency in Bajakajian, the forfeiture of the antique platter did not raise Eighth Amendment concerns as it was "classic contraband [precisely because it had been] imported into the United States in violation of law." Id. Similarly, in In Re 1650 Cases of Seized Liquor, 168 Vt. 314 (1998), the Vermont Supreme Court held that a state law providing for forfeiture of liquor transported through Vermont without the required liquor transport license did not implicate the Eighth Amendment under Bajakajian because, lacking the required license, the liquor had become contraband, rendering it forfeitable irrespective of the innocence of the owner. See id. at 325-37. The analogy to the Defendant Diamonds is clear: the absence of a KPC renders the diamonds, like the liquor, contraband subject to forfeiture regardless of the state of mind of the owner.

### C.    Kalisch's Counter Arguments

Kalisch attempts to distinguish these authorities and portray the forfeiture of the Defendant Diamonds as punitive by drawing unconvincing parallels between the forfeiture of his diamonds and the currency forfeited in Bajakajian and United States v. $293,316 in United States Currency, 349 F.Supp.2d 638 (E.D.N.Y. 2004). See Deft.'s Mem. at 25, Deft.'s Opp. at 21. In $293,316, Judge

Weinstein held that the civil *in rem* forfeiture of currency attempted to be exported in violation of currency reporting laws was a violation of the Excessive Fines Clause under Bajakajian. Specifically, Judge Weinstein found that, although the proceeding had been styled as one *in rem*, the civil forfeiture of currency in that case was punitive in nature because it was predicated upon the commission of another crime and could not have been imposed upon an innocent owner. See id. at 644-45.

Kalisch argues that the CDTA is "really a reporting requirement," more analogous to the currency reporting violations in $293,316 and Bajakajian than to attempts to evade customs duties or smuggle goods, see Deft.'s Opp. at 21. This strained analogy extracts words from any meaningful context, ignoring a key difference between the purpose of currency reporting statutes and the purposes of customs laws requiring the furnishing of information such as the CDTA's KPC requirement. Currency reporting is designed to obtain information regarding currency entering and leaving the United States. By contrast, customs laws are designed not only to control the amounts and values of goods in transit to and from the United States, but also to accomplish additional policy objectives, such as levying proper duties and removing from the stream of commerce goods that are contrary to public policy. As Judge Weinstein noted regarding An Antique Platter of Gold, the "false statements on customs forms regarding [an antique's] value and country of origin . . . affect[] the imposition of customs duties and [the] determination of whether the platter was stolen." $293,316 in United States Currency, 349 F.Supp.2d at 645 (citing An Antique Platter of Gold, 184 F.3d at 135-37)). Similarly, Kalisch's failure to provide in a KPC information regarding the value and country of origin the Defendant Diamonds affects the determination of whether the diamonds will be admitted into the United States as controlled by the KPCS. In short, Kalisch's observation that the

CDTA requires, in part, that an importer of rough diamonds report information to an agency of the United States Government is so general as to be meaningless in understanding the purpose and mechanisms of the Act. It therefore sheds no light on whether the purposes of the Act are remedial as distinguished from punitive, or whether the Act's forfeiture provision is subject to the Excessive Fines Clause.

Kalisch further attempts to analogize Bajakajian and $293,316 to this case by arguing that because the Defendant Diamonds, like the currency at issue in those cases, are not themselves illegal to possess, they are not "classic contraband" under the customs laws. See Deft.'s Mem. at 24-25. Post-Bajakajian cases make clear, however, that forfeiture of items imported in violation of applicable law, i.e. an antique platter of gold imported through a false customs declaration and cases of liquor brought into a state without a liquor-transporting license, are remedial *in rem* civil forfeitures regardless of whether possession of the items is independently illegal. See An Antique Platter of Gold, 148 F.3d at 140; In re 1650 Cases of Seized Liquor, 168 Vt. at 325-37; cf. One Lot Emerald Cut Stones and one Ring v. United States, 409 U.S. 232, 233 (1972) (regardless of whether possession of jewelry was illegal, its forfeiture after importation without submitting proper customs forms was remedial, not punitive, for purposes of Double Jeopardy Clause). Thus, whether it is legal to possess rough diamonds unaccompanied by a KPC is not irrelevant to the determination of whether their forfeiture under the CDTA is remedial.

Finally, Kalisch argues that the forfeiture here is not remedial because it does not compensate the Government for any unpaid customs duties, but rather, like the forfeiture in Bajakajian,

compensates, if at all, for loss of information. See Deft.'s Mem. at 24.[16] This argument incorrectly

assumes that only forfeitures which compensate for a pecuniary loss are remedial in nature. For

example, as the district court in United States v. Approximately 600 Sacks of Green Coffee Beans

Seized from Cafe Rico, 381 F.Supp.2d 57, 63-64 (D.P.R. 2005), recognized, a forfeiture imposed

to remove items unfit for human consumption is remedial. See also United States v. An Antique

Platter of Gold, 148 F.3d 131, 140 (2d Cir. 1999) (forfeiture of antique introduced contrary to law

was remedial because the forfeiture remedied violation of customs laws, although pecuniary loss to

the government was not at issue).[17]

Thus, the court holds that the CDTA's forfeiture provision does not implicate the Excessive

Fines Clause under the principles set forth in Bajakajian.


## IV.    The CBP's Refusal to Remit Forfeiture Under § 1618

In a final effort to evade forfeiture, Kalisch urges the court to reverse the CBP's refusal to

remit the forfeiture under 19 U.S.C. § 1595a(c)(5) on the ground that the CBP allegedly failed to

consider certain identified factors in making its determination. See Deft.'s Mem. at 24-28. As noted

earlier, see supra n. 8, § 1595a(c)(5) provides that in the case of any forfeiture of merchandise

---

[16]     Kalisch contends that the Government has not even suffered a loss of information from his failure to present a KPC because "[t]here is no question that the diamonds came from Brazil." See Deft.'s Mem. at 24. This argument ignores that the purpose of the CDTA's requirement of a KPC is to avoid the time-consuming, costly, and likely unreliable process of determining the source of a particular shipment of rough diamonds by requiring certification from the proper foreign authorities.

[17]     Moreover, although Kalisch is correct that the forfeiture of the Defendant Diamonds does not compensate for a pecuniary loss to the Government, this argument ignores the Supreme Court's acknowledgment that forfeitures imposed for violations of customs laws are remedial, regardless of whether they remedy a pecuniary loss. See Bajakajian, 524 U.S. at 531.

authorized by § 1595a, the government may "remit the forfeiture under section 1618 of this title."

Section 1618, in turn, provides, in relevant part:

> Whenever any person interested in any . . . merchandise . . . seized under the provisions of this chapter, . . . files with the Secretary of the Treasury if under the customs laws, . . . before the sale of such . . . merchandise . . . a petition for the remission or mitigation of such . . . forfeiture, the Secretary of the Treasury, . . . if he finds that such . . . forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to . . . violate the law, or finds the existence of such mitigating circumstances as to justify the remission or mitigation of such . . . forfeiture, may remit or mitigate the same upon such terms and conditions as he deems reasonable and just, or order discontinuance of any prosecution relating thereto.

19 U.S.C. § 1618(a).

As an initial matter, as the Government points out, Kalisch advances this argument in violation of Rule 8(a), Fed. R. Civ. P., which requires that any counterclaim by a party set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Kalisch failed to present this claim by counterclaim or in his Statement of Claim, see Dkt. No. 4, and raises it for the first time in his motion for summary judgment, years after the commencement of this lawsuit. The argument is thus not properly before the court. See, e.g., Andrx Pharm. v. Biovail Corp., 276 F.3d 1368, 1379-80 (Fed. Cir. 2002).

In any event, this court is not empowered to review an agency's denial of remission of forfeiture under § 1618 because such a decision "is a matter of grace and discretion delegated solely to the exclusive authority of the administrative agency (or Attorney General)." LaChance v. Drug Enforcement Admin., 672 F.Supp. 76, 79-90 (E.D.N.Y. 1987) (citing United States v. One 1970 Buick Riviera Automobile, 463 F.2d 1168, 1170 (5th Cir. 1972) (noting that judicial review of denial of request for remission is "controlled by the long-standing, judge-made rule that the Attorney

General has unreviewable discretion over petitions under 19 U.S.C. § 1618"); see also Concepcion v. United States, 938 F.Supp. 134, 139 (E.D.N.Y. 1996) ("recognizing that [the court] has no jurisdiction to review the merits of the administrative forfeitures [under § 1618] at issue in th[e] action") aff'd Concepcion v. United States, 116 F.3d 465 (2d Cir. 1997); Lopes v. United States, 862 F.Supp. 1178, 1184 (S.D.N.Y. 1994) (noting that "the decision whether to remit or mitigate the forfeiture is within the domain of the forfeiting agency, and once the agency has made a determination on the petition for remission or mitigation, courts generally have no power to review that decision.").[18] Kalisch has pointed to no persuasive authority to the contrary. Accordingly, the court declines to reverse the CBP's decision to deny remission of forfeiture under § 1618.


## CONCLUSION

For the foregoing reasons, the United States' motion for summary judgment is granted and an order of forfeiture of the Defendant Diamonds is hereby granted. Kalisch's cross-motion is denied.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated: July 22, 2008
       Brooklyn, New York

---

[18]     Although there is an exception when the agency has committed a fundamental procedural error, see, e.g., Lopes, 862 F.Supp. at 1185, Kalisch has not claimed that CBP committed such an error, nor has the court been able to identify any such error from the record of the administrative proceedings. See Folkenflik Decl. Exs. A & B (letters of CBP denying petition for remission of forfeiture and petition for reconsideration of decision).

SERVICE LIST:

**Plaintiff's Counsel**

**Laura D. Mantell**
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820

**Claimant Kalisch's Counsel**

**David Murphy**
399 Park Avenue. 25th Fl
New York, NY 10022
(212)557-4000

**Howard B. Brownstein**
Brownstein Booth & Associates
512 42nd Street
Union City, NJ 07087

**Claimant Maple Trade's Counsel**

**Hilton Soniker**, **Michael A. Schwartz and Martin Stewart Klein**
Kamerman & Soniker, P.C.
470 Park Avenue South
12th Floor South
New York, NY 10016

cc:          Magistrate Judge Go